UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

RAJNISH GULATI,

              Plaintiff,             Civil No. 12-5298 (NLH/KMW)

v.

RAY H. LAHOOD, SECRETARY,         **OPINION**
U.S. DEPARTMENT OF TRANSPORTATION,

              Defendant.

_____

**APPEARANCES:**

Michael S. Fettner, Esquire
Michael T. Sweeney, Esquire
Lyman & Ash
1612 Latimer Street
Philadelphia, Pennsylvania 19103

     *Attorneys for Plaintiff*

Elizabeth Ann Pascal, AUSA
U.S. Department of Justice
Office of the U.S. Attorney
401 Market Street
P.O. Box 2098
Camden, New Jersey 08101

     *Attorneys for Defendant*

**HILLMAN, District Judge:**

    In this action, Plaintiff, Rajnish Gulati, alleges that he was not promoted in his employment, despite being well-qualified for the position, because of his race, religion and national origin, in violation of Title VII of the Civil Rights Act of 1964 (hereafter, "Title VII"), 42 U.S.C. § 2000e et seq.

1

Plaintiff also alleges that he was not promoted based upon his age, in violation of the Age Discrimination in Employment Act of 1967 (hereafter, "ADEA"), 29 U.S.C. § 621 et seq.  In addition, the complaint contains a claim for hostile work environment under Title VII.  Presently before the Court is a motion for summary judgment filed by Defendant, Anthony Foxx, Secretary of the United States Department of Transportation.[1]  The Court has considered the submissions of the parties[2] and decides this matter pursuant to Fed. R. Civ. P. 78.

For the reasons that follow, Defendant's motion for summary judgment will be granted in part and denied in part.

I.   **BACKGROUND**

Plaintiff identifies his race as Indian, Asian, Indian subcontinent.  (Def.'s Statement of Material Facts Not in Dispute [Doc. No. 26-21] (hereafter, "Def.'s SOF") ¶ 4.)  Plaintiff's country of origin is India.  (Id.)  His religion is

---

[1] Defendant notes that Secretary Ray H. Lahood was previously the Secretary for the Department of Transportation, but he has since been replaced by Anthony Foxx.  (Def.'s Br. in Supp. of Mot. for Summ. J. [Doc. No. 26-1] 1.)  Defendant contends, and the Court agrees, that Mr. Foxx, in his official capacity, should be substituted as the proper defendant pursuant to Federal Rule of Civil Procedure 25(d).

[2] In opposition to the summary judgment motion, Plaintiff filed a number of exhibits under seal but failed to file a motion to seal as required by Local Civil Rule 5.3(c).  Plaintiff is therefore directed to file a motion to seal in accordance with the Local Rules within twenty days.

Hindu.  (Id. ¶ 5.)  Plaintiff was born in 1967, and he was forty-two years old at the time he was not selected for the position at issue in this case.  (Id. ¶ 6.)

Since 1993, Plaintiff has worked as an electronics engineer at the William J. Hughes Technical Center (hereafter, "Tech Center") in Pomona, New Jersey.  (Id. ¶¶ 2, 3.)  The Tech Center is part of the Federal Aviation Administration (hereafter, "FAA").  (Id. ¶ 2.)  At all times relevant to this action, Plaintiff held a Grade-13, Step-7 position on the federal government service pay scale.  (Id. ¶ 11.)

In 2009, the FAA posted vacancy announcements for two Level-14 positions with opening dates of May 20, 2009 and closing dates of June 17, 2009.  (Id. ¶¶ 7, 8.)  Vacancy announcement ACT-AJP-09-AJS7A30-13487 was for a Level-14 Electronics Engineer position, and vacancy announcement ACT-AJP-09-AJS7A30-13488 was for a Level-14 Computer Specialist position.  (Id.)  Each vacancy announcement advised applicants that a selection would be made from the submissions in response to one vacancy announcement or the other.  (Id. ¶ 10.)  These announcements sought to fill an opening in the Communications Team of the Test and Evaluation Services Group at the Tech Center.  (Id. ¶ 12.)  The announcements stated that the person selected for the position would serve as a "technical test lead" who would be "responsible for leading Voice over IP System

3

Integration Study tests and evaluations," as well as "assisting or taking a leadership role on other communication projects within the Communication Team." (Decl. of Elizabeth A. Pascal [Doc. No. 26-22] (hereafter, "Pascal Decl.") Ex. C, Ex. D.)

Plaintiff applied for both vacancies and made a "referral list" as a qualified candidate for each. (Def.'s SOF ¶ 43.) However, Plaintiff was not selected for the position. (See id. ¶ 48.) Radamé Martinez, the Manager of the Communications Team of the Test and Evaluation Services Group at the Tech Center, was the selecting official for the position. (Id. ¶¶ 15, 36.) Martinez selected another FAA employee, Eduardo Colon-Madera, for the position. (Id. ¶ 48.) Colon-Madera's national origin is Hispanic, and he was under age forty at the time of his selection. (Id. ¶ 49.) Like Colon-Madera, Martinez's national origin is Hispanic. (Id. ¶ 37.)

Plaintiff contends in the complaint that he was not selected for the Level-14 position because of his race, religion, national origin and age. (Compl. [Doc. No. 1] ¶¶ 21, 36.) In support of this contention, Plaintiff asserts that Martinez made derogatory statements about Plaintiff's national origin and religion, and then selected a candidate who, like Martinez, was from Puerto Rico. (Id. ¶¶ 26, 29.) In addition, Plaintiff asserts a hostile work environment claim on the basis that Martinez made statements "comparing Jews and Indians in

4

terms of their wealth, and by saying to plaintiff: 'Aren't all you Indians rich doctor, gas station owner, motel owner go don't need money [sic].'"  (Id. ¶ 32.)

## II.  **JURISDICTION**

Plaintiff asserts claims under Title VII and the ADEA, and the Court therefore has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## III. **STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' . . . demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citing Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  "In considering a motion for summary judgment, a district court may

not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(citing Anderson, 477 U.S. at 255, 106 S. Ct. 2505).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323, 106 S. Ct. 2548 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."); see also Singletary v. Pa. Dept. of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof.")(citing Celotex, 477 U.S. at 325, 106 S. Ct. 2548).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts

showing that there is a genuine issue for trial.  <u>Celotex</u>, 477
U.S. at 324, 106 S. Ct. 2548.  A "party opposing summary
judgment 'may not rest upon the mere allegations or denials of
the . . . pleading[s.]'"  <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228,
232 (3d Cir. 2001).  For "the non-moving party[ ] to prevail,
[that party] must 'make a showing sufficient to establish the
existence of [every] element essential to that party's case, and
on which that party will bear the burden of proof at trial.'"
<u>Cooper v. Sniezek</u>, 418 F. App'x 56, 58 (3d Cir. 2011) (citing
<u>Celotex</u>, 477 U.S. at 322, 106 S. Ct. 2548).  Thus, to withstand
a properly supported motion for summary judgment, the nonmoving
party must identify specific facts and affirmative evidence that
contradict those offered by the moving party.  <u>Anderson</u>, 477
U.S. at 257, 106 S. Ct. 2505.

## IV.  <u>ANALYSIS</u>

### A.  **Counts One and Three -- Title VII Discrimination and ADEA Violation**

#### 1.  **Evidentiary Burdens**

Title VII prohibits employment discrimination on the basis
of race, color, religion, sex, or national origin.  42 U.S.C. §
2000e-2.  The ADEA prohibits employment discrimination on the
basis of age.  29 U.S.C. § 623.

To establish that an employment decision was made for a
discriminatory reason, a plaintiff can rely on either direct or

circumstantial evidence.  Direct evidence of discrimination
"'demonstrates that the 'decisionmakers placed substantial
negative reliance on an illegitimate criterion in reaching their
decision.''" Anderson v. Wachovia Mortg. Corp., 621 F.3d 261,
269 (3d Cir. 2010) (internal citations omitted).  "[T]he
evidence must be strong enough 'to permit the factfinder to
infer that a discriminatory attitude was more likely than not a
motivating factor in the [defendant's] decision.'" Id.
(internal citations omitted).  In addition, the "evidence must
be connected to the decision being challenged by the plaintiff."
Id.  "Direct evidence of discrimination must be 'so revealing of
[discriminatory] animus that it is unnecessary to rely on the
[McDonnell Douglas] burden-shifting framework, under which the
burden of proof remains with the plaintiff.'" Id. (quoting
Walden v. Georgia-Pacific Corp., 126 F.3d 506, 512 (3d Cir.
1997)).

    If a plaintiff does not have direct evidence of
discrimination and instead relies on circumstantial evidence,
the Court employs the burden-shifting framework established in
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803-05, 93 S.
Ct. 1817, 36 L. Ed. 2d 668 (1973), for claims brought under
Title VII and the ADEA.  Ezold v. Wolf, Block, Schorr & Solis-
Cohen, 983 F.2d 509, 522 (3d Cir. 1992); Smith v. City of
Allentown, 589 F.3d 684, 689 (3d Cir. 2009).  Under that

8

framework, a plaintiff must first establish a prima facie case. The elements of a prima facie case depend on the facts of the particular case, and it cannot be established on a "one-size-fits-all" basis. <u>Jones v. Sch. Dist. of Philadelphia</u>, 198 F.3d 403, 411 (3d Cir. 1999).

If the plaintiff presents a prima facie case, the burden of production then shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994) (quoting <u>McDonnell Douglas</u>, 411 U.S. at 802, 93 S. Ct. 1817). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." <u>Id.</u> "The employer need not prove that the tendered reason <u>actually</u> motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." <u>Id.</u> (emphasis in original). The employer's burden of production is light. <u>Id.</u>

"Once the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the

plaintiff's burden of persuasion)." <u>Id.</u>

To defeat summary judgment when the employer has provided legitimate, non-discriminatory reasons for its action, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Fuentes</u>, 32 F.3d at 764.  In other words, a plaintiff may survive summary judgment by either "discrediting the proffered reasons, either circumstantially or directly," or by "adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  <u>Id.</u>

If the plaintiff relies on the first method, by attempting to discredit the defendant's proffered reasons, he must present evidence that allows a factfinder "reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action[.]"  <u>Fuentes</u>, 32 F.3d at 764. The plaintiff must:

> demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder <u>could</u> rationally find them

> "unworthy of credence," and hence infer "that
> the employer did not act for [the asserted] non-
> discriminatory reasons."

Fuentes, 32 F.3d at 765 (emphasis in original).

If the plaintiff relies on the second method, by presenting evidence that discrimination was more likely than not a motivating factor in the adverse employment action, he may meet this burden by "showing that the employer in the past had subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons[.]"  Id.

### 2.  Analysis

#### a.  Direct Evidence of Discrimination

In this case, Plaintiff appears to rely upon both direct and circumstantial evidence of discrimination with respect to his claims for national origin and religious discrimination.[3] The direct evidence presented by Plaintiff includes two statements that were made by Martinez to Plaintiff's brother, Alok Gulati, who also worked at the FAA and was a member of

---

[3] There is no direct evidence concerning race or age discrimination, and claims based on these protected characteristics will only be analyzed pursuant to the McDonnell Douglas standard.

Martinez's team.[4]

The first comment, which was made on or about June 17, 2009, was asserted in connection with a conversation about Alok Gulati's donations to the Disabled Veterans National Foundation, when Martinez purportedly said in a derisive tone, "'good, you should, you can afford it.  [Y]ou make a good salary.'"  (Aff. of Complainant Alok Gulati [Doc. No. 29-11] (hereafter, "A. Gulati Aff." 8.)  When Alok Gulati responded that he did earn a good salary, Martinez allegedly said "'aren't you all Indians doctors, lawyers, motel & gas station owners[.]'"  (Id.)

Then, after Martinez selected Colon-Madera for the Level-14 position, in response to an inquiry as to the basis upon which Martinez made his decision, Martinez purportedly told Alok Gulati, "'I know you're upset with my decision, but it's my decision and I made it because I am a Christian[.]'"  (Id. at 15.)  Although Martinez denies making these statements, the Court will assume he made such statements for purposes of

_____

[4] It is unclear whether Plaintiff cites this evidence as direct evidence of discrimination, so as to avoid the McDonnell Douglas analysis, or whether such evidence is offered in an effort to show pretext under the McDonnell Douglas analysis.  Plaintiff discusses the direct evidence of discrimination in an attempt to discredit Defendant's proffered reasons for selecting Colon-Madera over Plaintiff.  (Pl.'s Br. in Opp. to Summ. J. Mot. of Def. [Doc. No. 30] 7-8.)  However, Plaintiff also states at the end of his analysis that the McDonnell Douglas inquiry is unnecessary because Plaintiff presented sufficient direct evidence of discrimination.  (Id. at 21.)  The Court therefore treats the evidence as direct evidence of discrimination.

12

deciding this summary judgment motion.

In order for the comments to serve as direct evidence of discrimination, the Court must consider how and if they are related to the adverse employment action.  See Anderson, 621 F.3d at 269; Parker v. Verizon Pa., Inc., 309 F. App'x 551, 558-59 (3d Cir. 2009).  "'Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.'"  Parker, 309 F. App'x at 559 (quoting Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 133 (3d Cir. 1997)).  The Court takes the following factors into account when considering stray remarks: "(1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement."  Id. at 559.

Martinez was the speaker and made the decision concerning promotion of an applicant to the Level-14 position. Additionally, the statements were made within close temporal proximity of the adverse employment decision.  The first statement, which occurred in June 2009, was made approximately two months before Martinez chose a candidate for the Level-14 position.  The second statement was made shortly after Martinez selected Colon-Madera for the position.

13

The first comment was unrelated to the decision-making process.  The statement appears to have been an isolated or stray remark about national origin.  Plaintiff cites no proof of any other comments by Martinez related to national origin.  The Court finds that this isolated statement fails to demonstrate that an invidious discriminatory reason was more likely than not a motivating cause of Martinez's selection.

The second comment was made by the decision-maker and was related to the decision about the Level-14 position.  Martinez stated that he made the employment decision because he is a Christian.  The United States Court of Appeals for the Third Circuit has noted that a "compelling example" of direct evidence of discrimination would be a statement that "'I'm firing you because you're not a Christian.'" Hankins v. City of Philadelphia, 189 F.3d 353, 365 (3d Cir. 1999) (quoting Venters v. City of Delphi, 123 F.3d 956, 973 (7th Cir. 1997)).  Here, much like the "compelling example" provided by the Third Circuit, Martinez directly stated that his decision was based on the fact he is Christian, thereby implying that Plaintiff was not promoted because he is not a Christian.

As stated above, direct evidence of discrimination must allow a factfinder "to infer that a discriminatory attitude was more likely than not a motivating factor in the [defendant's] decision.'" Anderson, 621 F.3d at 269 (internal citations

14

omitted).  The Court finds that if Martinez's statement is believed, a trier of fact could infer that Martinez utilized religion as a factor in selecting a candidate for the Level-14 position.  In light of this direct evidence of discrimination, the Court will deny Defendant's motion for summary judgment as to Count I insofar as that count asserts a claim for religious discrimination under Title VII.

> ### b.  Circumstantial Evidence of Discrimination

> #### 1.  Prima Facie Case of Discrimination

The Court next turns to the circumstantial evidence of discrimination based on race, national origin and age, which the Court evaluates under the McDonnell Douglas burden-shifting framework.  Defendant concedes for purposes of the summary judgment motion that Plaintiff has established a prima facie case of discrimination based upon race and national origin under Title VII.  Accordingly, Plaintiff is entitled to an inference of discrimination with respect to his race and national origin.

Defendant does not concede that Plaintiff has established a prima facie case of age discrimination.  (Def.'s Br. in Supp. of Mot. for Summ. J. [Doc. No. 26-1] (hereafter, "Def.'s Br.") 19-20.)  Defendant argues that Plaintiff must demonstrate that an employer took the alleged discriminatory action "because of" Plaintiff's age.  (Id. at 20.)  According to Defendant, Colon-Madera was not forty years old at the time he was selected for

the Level-14 position while the other applicants were over the age of forty, but this fact alone does not demonstrate that age was the motivating factor for Martinez's decision to promote Colon-Madera.  (Id. at 21-22.)  In response, Plaintiff notes that the criteria for selecting a candidate discriminated on the basis of age because these criteria gave preference to individuals with training within the past five years, which would thereby exclude older applicants who received training more than five years ago. (Pl.'s Opp. Br. 26.)  Plaintiff also cites a statement by Martinez in which he purportedly implied that employees with many years of work experience have not necessarily achieved anything.  (Id.)

The Court need not decide whether Plaintiff meets a prima facie case of age discrimination.  Even if the Court assumes that Plaintiff meets his prima facie burden, he cannot overcome the burden-shifting framework of McDonnell Douglas as to age discrimination as discussed below.

### 2. Legitimate, Non-Discriminatory Reason for Employment Action

The burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for the failure to promote Plaintiff. Defendant argues that it had a legitimate, non-discriminatory reason for selecting Colon-Madera instead of Plaintiff for the Level-14 position.  Defendant asserts in this regard that

16

Martinez chose Colon-Madera because his bid package was superior to the bid packages of the other applicants, including Plaintiff's.

Martinez testified at his deposition that he had requested the opportunity to hire someone for a Level-14 position for a "long, long time," but his requests were of low priority and never granted because he did not have a "marquis" project. (Martinez Dep., December 11, 2013 [Doc. No. 29-4] (hereafter, "Martinez Dep.") 79:15-80:3.)  At some point in 2009, however, there was an opportunity to hire someone in Martinez's branch, and he was told to prepare a bid package.  (Id. at 80:9-14.) This was the first time that Martinez had been tasked to put out a bid and make a selection for a Level-14 position.  (Def.'s SOF ¶ 18.)  He worked with the human resources department to draft and advertise the vacancy announcements.  (Id. ¶ 22.)

The vacancy announcements, under a section titled "How You Will Be Evaluated," stated that "[a]pplicants may be rated on the extent and quality of experience, education, and training relevant to the duties of the position(s)."  (Pascal Decl., Exs. C, D.)  The announcements then set forth four categories of "Knowledge, Skills and Abilities" (hereafter, "KSAs") by which applicants would be evaluated.  (Id.)  Martinez drafted the KSAs based on his knowledge of what the position's duties were going to entail, and by reviewing sample KSAs that had been used

17

previously.  (Def.'s SOF ¶ 23.)  Applicants submitted their bid
packages for the Level-14 position through an online application
system, and the human resources department reviewed each
application to ensure that it met the minimum qualifications for
the vacancy.  (Id. ¶¶ 33, 35.)  The human resources department
then forwarded the bid packages of the applicants who qualified
to Martinez for consideration.  (Id. ¶ 39.)  Martinez testified
that he was the "best qualified" to select an applicant for the
Level-14 position because he "knew what the work was."
(Martinez Dep. 135:3-6.)

Five FAA employees applied for the position as engineers:
Colon-Madera, Plaintiff, An H. Nguyen, Lowell W. Patak, and Alok
K. Gulati, who is Plaintiff's brother.  (Pl.'s Supp. Statement
of Disputed Material Facts [Doc. No. 29] (hereafter, "Pl.'s
Supp. SOF") ¶ 96.)  Seven FAA employees applied for the position
as computer specialists.  (Id. ¶ 97.)  Only Plaintiff and his
brother applied as both engineers and computer specialists.
(Id. ¶ 98.)  At the time of the job bid, Plaintiff, An Nguyen,
and Lowell Patak were not members of Martinez's team.  (Id. ¶
100.)

Martinez created rating sheets that evaluated an
applicant's response to each KSA as "superior," "satisfactory,"
or "barely acceptable," along with rationale for each rating.
(Def.'s SOF ¶ 47.)  Martinez spent approximately one month

18

reviewing the applications.  (Martinez Dep. 101:7-14.)[5]  He testified that he reviewed every application and considered each applicant's qualifications to pick "the best qualified person for this job[,]" regardless of his personal feelings.  (Id. at 92:4-17, 101:15-17.)  According to Martinez, selecting the most qualified person would make his job easier, for if he chose a less-qualified individual "the headaches will end up in [Martinez's] office all the time."  (Id. at 92:7-11, 97:14-17.)  Martinez opted not to conduct interviews because he knew all of the candidates except one, and because he had worked with most of the candidates he had first-hand knowledge about them.  (Id. at 88:5-10, 89:10-13.)

Ultimately, Martinez selected Colon-Madera for the Level-14 position.  According to the ratings sheets for the KSAs, Colon-Madera received a "superior" rating for KSAs #1 and #2, whereas Plaintiff received only a "satisfactory" rating for these KSAs.

---

[5] Plaintiff attempts to discredit the extent of Martinez's review process by noting that Martinez could not recall at his deposition the details of each applicant's resume.  (Pl.'s Opp. Br. 16.)  Plaintiff argues in this regard that although Martinez purportedly spent a month reviewing the applications, he "could not recall basic facts about Mr. Colon-Madera's work history" and "hemmed and hawed" when asked about Colon-Madera's experience.  (Id.)  The deposition was taken in December 2013, more than four years after Martinez made his decision about the Level-14 position, and Martinez repeatedly remarked during the deposition that he needed to review the applications to accurately answer counsel's questions.  (See Martinez Dep. 40:18-23.)

(Pascal Decl., Ex. K.)  Both Colon-Madera and Plaintiff received
a "satisfactory" rating for KSAs #3 and #4.  (Id.)

With respect to the comments for KSA #1, which evaluated
the applicants' knowledge of data and voice communication
networks, including in-depth expertise and hands-on experience,
Martinez noted that Colon-Madera had "[p]lenty of hands-on
experience in all areas[,]" whereas Plaintiff had "[l]ittle
experience in VoIP (theory) and no hands-on experience."  (Id.)
With respect to KSA #2, which evaluated the applicants' ability
to lead technical projects and teams, Martinez noted that Colon-
Madera "demonstrated that [he] can lead technical projects[,]"
whereas the tasks that Plaintiff claimed he led "are not
particularly complex tasks."  (Id.)  As for KSA #3, which
evaluated the applicants' ability to apply FAA approved test and
evaluation methodologies to communication networks test
programs, the comment for Colon-Madera stated that he has
"demonstrated knowledge of Test and Evaluation[,]" and Plaintiff
had "some experience in this area."  (Id.)  Finally, KSA #4
rated the applicants' ability to communicate effectively, and
Martinez noted that Colon-Madera was "[v]ery good with
interpersonal relationships" but there was "room for improvement
in writing skills."  (Id.)  His comment for Plaintiff was:
"[j]ust enough in the write-up to be rated satisfactory[,]" but
"[b]ased on the bid package write-up, his writing skills need

20

improvement." (Id.)

Martinez also testified about the reputations of the prospective applicants. According to Martinez, Colon Madera is a "very good worker" who "delivers all the time" and "takes the criticism and then does the job." (Martinez Dep. 79:6-8.) By contrast, Plaintiff did not have a good reputation at the Tech Center, as he was known for "not being a very good worker, very problematic, and . . . disappearing from the building." (Id. 118:3-9, 119:1-4.)

The Court finds that Defendant has offered legitimate, non-discriminatory reasons for failing to promote Plaintiff to the Level-14 position. Plaintiff met the threshold criteria to pass through the initial screening by the human resources department, but Defendant has presented evidence that Colon-Madera was selected for the promotion over the other applicants after Martinez considered non-discriminatory factors such as experience, the quality of each applicant's bid package, workplace history and background. Defendant has thus met its light burden of production, as it has introduced "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." See Fuentes, 32 F.3d at 763.

### 3. Whether Defendant's Proffered Reasons are Pretext for Discrimination

The critical issue in the instant case thus becomes whether Defendant's explanation for its failure to promote Plaintiff is merely a pretext for race, national origin, or age discrimination.

The Court already concluded that Martinez's statement that he made the promotion decision based on the fact that he is a Christian demonstrates that Martinez placed substantial negative reliance on an illegitimate criterion.  In light of this statement, any reasons proffered by Defendant for failing to choose Plaintiff for the Level-14 position would seem to be pretextual.  However, Plaintiff asserts in this case not only claims for religious discrimination, but also claims for race, national origin and age discrimination.  Each of these is a separate claim, and to prevail Plaintiff must prove that each of these characteristics played a role in Martinez's selection decision.  Plaintiff's burden of proof as to each separate claim is not met simply because he demonstrated for purposes of summary judgment that religion was used in the promotion decision.

Because there is no direct evidence of discrimination with respect to race, national origin or age, the Court considers whether Defendant's proffered reasons are pretextual under the

22

McDonnell Douglas framework.  As discussed below, the Court
concludes that there is insufficient evidence to demonstrate
that Defendant's proffered reasons were necessarily pretextual.[6]

Plaintiff's first assertion is that Martinez purportedly
selected Colon-Madera because of his experience, when Colon-
Madera was the applicant with the least overall experience.
(Pl.'s Opp. Br. 8.)  In this regard, Plaintiff contends that
Colon-Madera had "at most" six to seven years of experience,
when each of the other applicants had more than ten years of
experience.  (Id. at 8-9.)  Plaintiff also states that Colon-
Madera had not completed a trainee program, whereas several
other applicants including Plaintiff had completed such a
program.  (Id. at 9.)

As noted by Defendant, Martinez considered length of
service as a factor in his decision, but he also considered the
quality and relevance of the applicants' experience in his
decision.  (Def.'s Reply Mem. in Supp. of Def.'s Mot. for Summ.

---

[6] The Court concludes only that the evidence cited by Plaintiff
is not sufficient, in itself, to demonstrate that Defendant's
reasons are so weak, implausible and inconsistent that they are
"unworthy of credence."  However, such evidence may support a
pretext argument when coupled with direct evidence of
discrimination, such as Martinez's statement about religion.
Accordingly, while the Court finds that Plaintiff fails to
demonstrate under McDonnell Douglas that race, national origin
or age discrimination motivated Martinez's decision, the Court
does not at this time address whether the evidence cited by
Plaintiff can be used at trial as circumstantial evidence in
support of the religious discrimination claim.

J. [Doc. No. 31] (hereafter, "Def.'s Reply Br.") 6.)  Martinez testified that "[v]oice over IP at that time was brand new technology and . . . more recent training is the one that's really, really more useful.  Some training that you took ten years ago would not basically help you too much." (Martinez Dep. 30:11-15.)  Given the cutting edge nature of the technology at issue, years of service at the Tech Center would not necessarily provide relevant experience for the Level-14 position.  Moreover, Martinez testified that length of service did not equate with quality of service, noting that "[y]ou could be 30 years here and do nothing.  That doesn't fly with me." (Id. at 97:3-6.)

This evidence demonstrates that Colon-Madera had relevant experience in the specific field.  Colon-Madera was the only applicant who had actual experience as a lead in a Voice over IP (hereafter, "VoIP") project, having led such project over a three-year period.  (Id. at 27:24-28:10; Pascal Decl., Ex. L.) In addition to his experience with the technology at issue, Colon-Madera also had leadership experience.  (Pascal Decl., Ex. L.)  Plaintiff produced no evidence that he had any experience with VoIP technology, and Martinez found that Plaintiff had no experience leading a major project.  (Pascal Decl., Ex. K.) Accordingly, while Colon-Madera may have had less overall experience than the other applicants, this fact does not

24

discredit Martinez's contention that he selected Colon-Madera
because of his experience, when Colon-Madera had the most
relevant experience for the Level-14 position.

Plaintiff next contends that Martinez's explanations are
not worthy of credence because he testified that he did not
interview the applicants as he already knew of their
qualifications, but then testified that he did not know
Plaintiff well. (Pl.'s Opp. Br. 9.)  Martinez explained at his
deposition why he chose not to conduct interviews.  Martinez was
told he did not have to conduct interviews, and he opted not to
conduct them because he did not feel he could gain any new
information from the interviews.  (Martinez Dep. 88:14-89:13.)
He testified that he already knew all of the applicants except
one, as he worked with most of the applicants and had first-hand
knowledge of how they operated.  (Id. at 88:9-10, 89:12-13.)
While he did not know the additional applicant, he knew enough
about the applicant to determine that such applicant did not
have the proper knowledge for the position.  (Id. at 88:5-14.)
Martinez thus was able to rule out that applicant without
conducting an interview.

Plaintiff then argues that Martinez's explanation that he
selected Colon-Madera based upon his "superior" bid package is
not credible for several reasons.  (Pl.'s Opp. Br. 10.)  First,
Plaintiff asserts that Martinez testified that he relied on

information outside of the bid package in choosing Colon-Madera for the Level-14 position, and therefore could not have based his decision solely on a superior bid package.  (Id.)  Second, Plaintiff asserts that reliance on information outside of the application process "discriminates against applicants not supervised by Mr. Martinez."  (Id.)  The Court rejects both of these arguments.

In discussing his evaluation of Colon-Madera's bid package, Martinez noted that he had additional information about Colon-Madera because he had been his supervisor.  (See, e.g., Martinez Dep. 134:1-25.)  Therefore, if certain information was not specifically delineated in Colon-Madera's written application, Martinez nonetheless understood and considered such information based on his personal knowledge.  This statement is not inconsistent with Martinez's explanation that Colon-Madera had a superior bid package; Martinez's personal knowledge of Colon-Madera's background experience -- including a detailed understanding of the projects that Colon-Madera had worked on under Martinez's supervision -- merely supplemented the information in the bid package.

Furthermore, to the extent Martinez relied on information about applicants that he gained as their supervisor, such process does not discriminate against Plaintiff based on a protected characteristic.  An individual making an employment

decision need not put aside personal information gained about an applicant and proceed as if the applicant was a stranger. Fuentes, 32 F.3d at 767 ("It would defy common sense for an interviewer to put aside all his or her personal and/or acquired knowledge of the interviewee and to proceed as if the interviewee were a stranger, and Title VII does not mandate so much.").

Moreover, Plaintiff does not contend that there was a policy that precluded Martinez from using personal knowledge of the applicants in making his decision, nor does he cite authority that required Martinez to call each applicant's supervisors if he used information outside of the bid package for some of the applicants.  As noted above, Martinez testified that he had first-hand knowledge of most of the applicants, so he was able to utilize information gained as a supervisor for other applicants as well.  Indeed, it was Martinez's first-hand knowledge of most of the candidates that made him the "best qualified person" to make a selection for the Level-14 position. (Martinez Dep. 130:17-22.)  There is nothing discriminatory in Martinez's decision not to seek further information from Plaintiff's supervisors if he felt that Plaintiff did not have the requisite technological background for the job.

Plaintiff then criticizes the KSAs, arguing that they were too specific and were tailor-made to favor Colon-Madera, but the

evidence of record belies this assertion.  (Pl.'s Opp. Br. 19.)
To the extent Plaintiff believes that KSAs #1 and #2 were
"tailor-made" for Colon-Madera because they required training
within the past five years, Martinez explained that he added the
five year requirement because prior training would be irrelevant
given the cutting edge nature of the technology at issue, as
discussed above.  (Martinez Dep. 30:8-15.)  He also testified
that he settled on a five year period based on examples he had
seen in KSAs posted for other positions.  (Id. at 30:20-22.)
Furthermore, Martinez stated that several changes to the KSAs
were made based on discussions with the human resources
department, he did not recall being told that the KSAs were too
specific, and that human resources ultimately approved of the
KSAs.  (Id. at 82:21-83:21.)

The Court notes that it may not question whether the KSAs
set forth the proper criteria for judging the best candidate for
the Level-14 position.  In Ezold, the Third Circuit limited a
court's determination of pretext to the employer's articulated
reason.  The Third circuit specifically stated:

> Where an employer produces evidence that the plaintiff
> was not promoted because of its view that the
> plaintiff lacked a particular qualification the
> employer deemed essential to the position sought, a
> district court should focus on the qualification the
> employer found lacking in determining whether non-
> members of the protected class were treated more
> favorably.  Without such a limitation, district courts
> would be routinely called upon to act as members of an

> employer's promotion board or committee.  It would
> subjectively consider and weigh all the factors the
> employer uses in reaching a decision on promotion and
> then make its own decision without the intimate
> knowledge of the history of the employer and its
> standards that the firm's decisionmakers use in
> judging the degree to which a candidate exhibits a
> particular qualification that the employer has decided
> is of significance or primary importance in its
> promotion process.

Ezold, 983 F.2d at 528.  Thus, it is not for the Court to

judge the relevance or propriety of the KSAs to the

selection process, but merely to evaluate whether Plaintiff

met the criteria defined in the KSAs.

The Court therefore turns to Martinez's evaluation of the

responses to the KSAs.  In conducting this review, the Court

notes that its task is not to determine which of the candidates

would have been the FAA's best choice for the Level-14 position.

Plaintiff primarily disagrees with Martinez's evaluation of his

qualifications and argues that his experience was adequate.

However, Plaintiff's view of his performance is not at issue;

what matters is the perception of the decision maker.  Billet v.

CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991), overruled in part

on other grounds by St. Mary's Honor Ctr. v. Hicks, 509 U.S.

502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).  "The fact that

an employee disagrees with an employer's evaluation of him does

not prove pretext."  Id.  Plaintiff is required to adduce

sufficient evidence from which a trier of fact could conclude

that the FAA's articulated reason for the promotion decision was weak, improbable, and not worthy of credence.  Introducing evidence that, at best, indicates that Plaintiff was as qualified as Colon-Madera does not suffice.

KSA #1 stated as follows: "Knowledge of data and voice communication networks.  Definition: Describe experience that demonstrates your understanding of: (a) Data communications, data links, networks and protocols, routing, telecom networks and network security, and (b) Voice over IP networks, include a brief description of the activity or hands-on experience that led to this understanding.  Describe any specialized technical training that you may have completed in the areas mentioned above within the last 5 years." (Pascal Decl., Exs. C, D.)

The rating sheet that Martinez developed for this KSA had a rating scale of "superior," "satisfactory," or "barely acceptable" and defined each credit level.  To receive a "superior" rating, an applicant must have "work experience demonstrating in-depth expertise and hands-on experience with data and voice communications networks." (Pascal Decl., Ex. K (emphasis in original).)  To receive a "satisfactory" rating, an applicant must have "work experience demonstrating in-depth expertise in data and voice communication networks[,]" but hands-on experience was not required.  (Id. (emphasis in original).)  Martinez then included examples of these ratings: a

"superior" candidate would have a "minimum of 5 years experience working with complex data and voice communication networks with an emphasis on test and evaluation hands-on experience." (Id.) A "satisfactory" candidate would have a "minimum of 3 years experience in data and voice communication networks test and evaluation." (Id.)

Plaintiff argues that Colon-Madera did not deserve a "superior" rating because he did not have five years of experience. (Pl.'s Opp. Br. 11.) However, Plaintiff's focus on the temporal criterion contained in the example to KSA #1 is too narrow. A comparison of the definitions for the "superior" and "satisfactory" ratings demonstrates that the emphasis in this KSA was on hands-on experience. To receive a "superior" rating, an applicant must have had expertise as well as hands-on experience; an applicant with expertise but no hands-on experience would receive a "satisfactory" rating. (Pascal Decl., Ex. K.)

The evaluation sheet for KSA #1 demonstrates that Colon-Madera was the only candidate who had substantial hands-on experience. (Id.) By contrast, the evaluation sheet indicates that Plaintiff had no hands-on experience. (Id.) While Colon-Madera may not have had five years of experience as described in the example to this KSA, five years of experience was merely an illustrative statement and not a requirement of the KSA. Hands-

31

on experience, however, was specifically articulated in the KSA.

Plaintiff provides no evidence that he had hands-on experience

with data and voice communication networks.

In addition to hands-on experience, the KSA also considered

applicants' understanding of VoIP networks.  According to

Martinez's Justification Memorandum, Colon-Madera "has led the

Voice over Internet Protocol (VoIP) over the last three years

and delivered quality products in a timely manner."  (Pascal

Decl., Ex. L.)  Plaintiff represents that he "supported and led

voice switching and control systems (VSCS) and VSCS training and

backup switch (VTABS), and for three years, led the FAA

Telecommunications Infrastructure (FTI) Interoperability and

Laboratory Test Teams."  (Decl. of Rajnish Gulati [Doc. No. 29-

2] ¶ 6.)  Plaintiff cites other experience as well, but he does

not contend that any of this experience involved VoIP

technology.  By contrast, even Plaintiff concedes that only

Colon-Madera had experience in network security and VoIP

specialized training, which were the skills specifically

identified in KSA #1.  (Pl.'s Supp. SOF ¶ 103.)  Given Colon-

Madera's experience in the relevant technology, his hands-on

experience, and his recent training, Martinez's ratings of

Colon-Madera and Plaintiff are not so weak and implausible that

they are unworthy of credence.

Plaintiff also questions Martinez's ratings of KSA #2,

32

which considered applicants' ability to lead technical projects and teams.  The KSA stated: "Describe your technical and project management accomplishments and how they demonstrate your ability to complete complex work assignments in a timely manner as the lead of a technical project." (Pascal Decl., Ex. C, Ex. D.)  To receive a "superior" rating on this KSA, an applicant must have "extensive work experience demonstrating ability to effectively lead a project and achieve a desired outcome[,]" where a "satisfactory" rating would be given to an applicant with only "some work experience" leading a project. (Pascal Decl., Ex. K.)  Again, Martinez provided examples for this KSA, distinguishing the "superior" rating by a "minimum of 5 years experience" in leading complex communication projects test programs or tasks, while a "satisfactory" rating would be given for a "minimum of 3 years experience" in leading complex communication project test programs or tasks. (Id.)

Plaintiff focuses on the temporal element of the example without considering the substance of the KSA.  According to Plaintiff, he had substantial experience, citing his role as "FTI Technical Lead (Lab)," "FTI Test Lead," and "FTI Interoperability Lead." (Pls.' Opp. Br. 15.)  Martinez testified in his deposition that when he reviewed Plaintiff's application, he did not believe that any of the tasks identified involved leading a complex task. (Martinez Dep. 162:21-166:15.)

33

Accordingly, Plaintiff was not afforded a "superior" rating. Plaintiff provides no evidence to demonstrate the complexity of the projects that he led.  Even if such tasks were complex, Martinez's mistaken assessment of their complexity is not sufficient to discredit the FAA's proffered reason for the non-selection decision.  See Fuentes, 32 F.3d at 765.

By contrast, even Plaintiff concedes that Colon-Madera was the only candidate who had participated in an Executive Leadership Program (Pl.'s Response to Def.'s Statement of Material Facts Not in Dispute with Supp. Statement of Disputed Material Fact [Doc. No. 29] (hereafter, "Pl.'s Response to SOF") ¶ 71),[7] and Colon-Madera had led the VoIP project for three years.[8]  (Pascal Decl., Ex. L.)  The Justification Memorandum

---

[7] Plaintiff contends that KSA #2 required participation in the Executive Leadership Program.  (Pl.'s Response to SOF ¶ 71.) The KSA generally seeks information about leadership ability but does not expressly require participation in the Executive Leadership Program.

[8] According to Plaintiff, Martinez picked Colon-Madera to lead this project in May 2008 over a more senior engineer on the team, Alok Gulati, which provided Colon-Madera with the experience, knowledge and leadership skills that were later used to justify Colon-Madera's promotion to the Level-14 position. (Pl.'s Opp. Br. 12.)  The record regarding Colon-Madera's selection to lead the VoIP project in 2008 contains significant factual differences: Alok Gulati contends that he asked to be made the new VoIP lead but Martinez failed to honor this request, while Martinez testified that Alok Gulati refused to take the position and suggested that Colon-Madera be appointed instead.  (Def.'s SOF ¶ 59; Alok Aff. 18.)  Even assuming that Martinez chose Colon-Madera over Alok Gulati in 2008, there is no indication in the record that such selection was made because

also indicates that Colon-Madera was a "factory lead for FTI security and interoperability teams." (Id.) Although the amount of time that Colon-Madera spent leading these teams is unclear, based on the totality of leadership experience identified in the record, the Court concludes that Martinez's decision to give Colon-Madera a "superior" rating on KSA #2 based on his leadership experience is not so weak and implausible that it is unworthy of credence.

For KSAs #3 and #4, Martinez gave both Colon-Madera and Plaintiff "satisfactory" ratings. Plaintiff challenges Martinez's assessment because he contends that he should have received a "superior" rating for both KSAs given that he had the amount of experience identified in the examples for the KSAs. (Pl.'s Opp. Br. 12.)

KSA #3 considered the applicants' "[a]bility to apply FAA approved test and evaluation methodologies to communication networks test programs." (Pascal Decl., Ex. C, Ex. D.) The analysis included "work experience that demonstrates knowledge of the conduct of test and evaluation per FAA approved policies and guidelines involving hardware and/or software. Of

---

of a protected characteristic, nor is there any evidence in the record that Martinez knew at that time that the Level-14 position would be created. As such, Plaintiff's theory that Martinez's appointment of Colon-Madera to lead the VoIP project in 2008 was a strategic effort to position Colon-Madera for the Level-14 position is unsupported by the record.

particular interest is experience with testing of data and voice communication networks, equipment and technologies." (Pascal Decl., Ex. K.)  A "superior" rating was defined as "extensive work experience involving testing of hardware and/or software, with a focus on communication networks, equipment and technologies," and the testing experience must indicate "extensive skill in developing test beds and also with following formal test processes[.]"  (Id.)  A "satisfactory" rating was defined as "some work experience" in the same areas, and the testing experience must indicate "some" skill rather than "extensive" skill.  (Id.)

Again, as with the prior KSAs, Plaintiff focuses on the duration component of the example for the KSA without emphasis on the specific area of skill identified in the KSA. Plaintiff's overall experience at the FAA does not mean that he had "extensive skill" in "developing test beds," with "following formal test processes," and in "preparing test documents." (Id.)  Martinez concluded that Plaintiff has "some" experience in the requisite areas (id.), and Plaintiff does not specifically explain why his experience and the projects he worked on at the FAA gave him the experience and skill necessary to achieve a "superior" rating on KSA #3.  Plaintiff's conclusory assertion that he should have been rated "superior" is insufficient to demonstrate that Martinez purposefully under-

rated Plaintiff on this KSA.  <u>See</u> <u>Reap v. Continental Cas. Co.</u>,
No. 99-1239, 2002 WL 1498679, at *17 (D.N.J. June 28, 2002) (it
is "[t]he decisionmaker's perception, not the plaintiff's
perception of [him]self, [that] is the relevant consideration,
and a court's role is not 'to second-guess an employer's
business judgment as to who is more qualified for the
job.'")(internal citation omitted).

     Finally, KSA #4 evaluated the applicants' ability to
communicate effectively, which included, <u>inter</u> <u>alia</u>, an "ability
to provide oral and written communications for the transfer of
pertinent project related information to others[.]"  (Pascal
Decl., Ex. K.)  To achieve a "superior" rating, an applicant
must have a demonstrated ability to communicate in writing,
whereas a "satisfactory" rating would be given to applicants who
could effectively orally communicate without any demonstrated
writing skills.  (<u>Id.</u>)  Martinez gave Plaintiff a "satisfactory"
rating because "his writing skills need improvement."  (<u>Id.</u>)
Plaintiff contends that he should have received a "superior"
rating because he had ten more years of experience at the Tech
Center (Pls.' Opp. Br. 12), but his overall experience at the
Tech Center does not inform whether he had the writing skills
necessary to obtain the highest rating.

     In addition to casting doubt on Defendant's explanations
for promoting Colon-Madera instead of Plaintiff, Plaintiff also

pursues the alternate route by pointing to evidence from which a factfinder could reasonably conclude that discrimination on the basis of race, national origin or age was the more likely cause of the failure to promote Plaintiff to the Level-14 position.

Plaintiff first highlights the purported inconsistent level of scrutiny given to each application, arguing that Martinez overlooked deficiencies and errors on Colon-Madera's application, gave too much weight to Colon-Madera's experience, did not give sufficient weight to other applicants' experience, and focused on the deficiencies in Plaintiff's application. (Pl.'s Opp. Br. 14.) This argument focuses on the substance of the written applications, when Martinez testified that he knew most of the applicants and therefore had information about them beyond the information contained in their written submissions.

Moreover, even if Martinez did not give proper weight to each applicant's qualifications, this is not evidence of discriminatory motive. "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken[.]" Fuentes, 32 F.3d at 765. If Martinez misjudged the qualifications of the applicants, such mistake does not prove his reason is "unworthy of credence" in and of

itself.  Ezold, 983 F.2d at 530.  There is no evidence that
any of the other applicants had the same level of
experience leading a VoIP project and recent training
relevant to the position, let alone that other applicants
were more qualified than Colon-Madera for the Level-14
position.

Plaintiff then theorizes that Martinez favored Colon-Madera
because they are both Hispanic and are both from Puerto Rico,
but there is no evidence in the record to support this
hypothesis.  (Pl.'s Opp. Br. 20.)  When Colon-Madera was a
student in Puerto Rico, Martinez was sent as part of a
recruiting trip to Puerto Rico and interviewed Colon-Madera at
that time.  (Martinez Dep. 75:1-12.)  The team who went to
Puerto Rico interviewed approximately thirty students, created a
list of recommendations, and provided the list to FAA personnel
upon returning to the Tech Center.  (Id. at 76:6-8, 77:3-6.)
Thereafter, Colon-Madera was hired at the Tech Center by another
individual, without Martinez's knowledge, and when Martinez
encountered Colon-Madera in the Tech Center he did not even
remember him.  (Id. at 76:9-17.)

Furthermore, Martinez denied that he had any bond with
Colon-Madera, and specifically stated that he did not have any
bond with him because they are both from Puerto Rico.  (Id. at
78:19-24, 79:5-6.)  Martinez even testified that just because

they were both from the same country did not create an
instantaneous bond, and that "there are people from Puerto Rico
here which I really don't want to talk to them." (Id. at 78:25-
79:4.)  Based on this evidence, the facts do not support a
"reasonable inference" that Martinez took a particular interest
in Colon-Madera when the two met in Puerto Rico and that
Martinez promoted Colon-Madera to the Level-14 position because
they shared the same background.

Plaintiff also posits that the tone of Martinez's
deposition demonstrates discriminatory animus.  It appears from
the deposition testimony that Martinez did not hold Plaintiff or
his brother in high regard, but the transcript provides ample
non-discriminatory reasons for such opinion.  According to
Martinez, Plaintiff's brother, who worked under Martinez, "had a
history of doing inappropriate things and crossing the line."
(Martinez Dep. 91:1-3.)  Plaintiff also did not have "a very
good reputation" at the Tech Center, as the assessment of
Plaintiff by others was that he was not "a very good worker,"
was "very problematic," and had a history of "disappearing from
the building." (Id. at 118:5-9, 119:1-4.)  Both brothers had a
reputation of being unavailable. (Id. at 123:5-7) ("One of the
traits of these two brothers is that they disappear from the
building all the time.  Everybody knows that around here.")
Martinez even conceded at his deposition that he considered

40

Plaintiff's reputation when making a decision about the Level-14 position, having testified that "[i]t probably played a role" in the decision because "[w]ho wants a lead who you can't find and who can't deliver projects and who can't deliver products, and by the way, who deliver products that are low quality, too?" (Id. at 129:23-130:4.)

If Martinez had "obviously strong negative feelings" about Plaintiff's brother and "animus toward [P]laintiff," as argued by Plaintiff (Pl.'s Opp. Br. 17, 18), the record demonstrates that such feelings were created because of Plaintiff and his brother's work ethic, not their race, national origin, or age.

Another example of purported discriminatory animus discussed by Plaintiff is an alleged hostile work environment. (Id. at 18.)  Plaintiff asserts in this regard that in 2005 and 2006, when Martinez was his supervisor, he returned from sick leave and repeatedly requested to be returned to his prior group, but Martinez ignored such requests.  (Id.)  It appears from the record that Plaintiff did not get along with Martinez, but there is no evidence from which a reasonable juror could infer that the way Plaintiff was treated at work had anything to do with his race, nationality, or age.  Plaintiff may have experienced personality conflicts with Martinez resulting in a less than ideal work environment, but this is not actionable under Title VII.  Fairclough v. Wawa, Inc., 412 F. App'x 465,

41

469 (3d Cir. 2010).

Finally, Plaintiff cites a "culture" at the FAA whereby members of various ethnic groups purportedly tend to socialize only with each other.  (Pl.'s Opp. Br. 20.)  Plaintiff contends that each group takes meals and work breaks together, noting that Martinez and Colon-Madera even exchanged e-mails written in Spanish.  (Id.)  This argument fails to establish that discrimination based on race, national origin or age was the most likely cause that Plaintiff was not promoted to the Level-14 position.  As noted by the United States Court of Appeals for the Seventh Circuit, "[p]eople who share a common culture tend to work together as well as marry together and socialize together.  That is not evidence of illegal discrimination." E.E.O.C. v. Consol. Serv. Sys., 989 F.2d 233, 237 (7th Cir. 1993).[9]

Viewing all of the evidence in a light most favorable to Plaintiff, the evidence does not demonstrate that Plaintiff was more qualified for the Level-14 position than Colon-Madera.  At best, both candidates were equally qualified, which is not sufficient to demonstrate that the promotion decision was

---

[9] Additionally, there is no evidence that such a culture exists at the FAA.  Martinez testified that he did not know of any such culture, and Plaintiff's only evidence is his own statement that such a culture exists without any independent evidentiary support.

42

motivated by discriminatory animus based on race, national origin or age.  The FAA successfully dispelled any inference of discrimination on the basis of race, national origin or age, and none of Plaintiff's evidence brought it back.  Even assuming that Martinez did favor Colon-Madera, there is no evidence that Martinez's favoritism of Colon-Madera was based on race, national origin or age.  "[F]riendship or cronyism is not a basis for relief under the ADEA or Title VII." Parks v. Rumsfeld, 119 F. App'x 382, 384 (3d Cir. 2005) (citing Platner v. Cash & Thomas Contractors, Inc., 908 F.2d 902, 905 (11th Cir. 1990)).

### B.   Count Two -- Hostile Work Environment

In opposing summary judgment, Plaintiff states that the hostile work environment claim is based on his interactions with Martinez from 2005 through 2007.[10]  Plaintiff represents that in 2005, he reported two of Martinez's Hispanic friends for misconduct.  (Pascal Decl., Ex. A at 3.)  Martinez was Plaintiff's supervisor at that time, and Plaintiff contends that Martinez retaliated against Plaintiff for his "whistle-blowing" activities.  (Id.)  In particular, Plaintiff represents that he was assigned from Martinez's department to a temporary detail,

---

[10] Notably, the complaint does not contain any allegations of conduct occurring prior to 2009 and failed to place Defendant on notice that the hostile work environment claim was premised on conduct that occurred between 2005 and 2007.

and Martinez thereafter refused to allow Plaintiff to return to his permanent position despite Plaintiff's repeated requests. (Id. at 3-4.)  Martinez also refused to allow Plaintiff to work from home after he was on sick leave in 2006.  (Id. at 4, 7.) Furthermore, Martinez purportedly failed to give Plaintiff performance evaluations in October 2006 and October 2007. (Pascal Decl., Ex. G.)  Martinez's actions allegedly caused Plaintiff to suffer stress, difficulties at home, and constant fear of being fired.  (Pascal Decl., Ex. A at 12.)  Eventually, in 2007, Plaintiff was reassigned to a new group, the EnRoute Automation Modernization Group, under the supervision of Angel Hassan-Miller and Vincent Lasewicz, Jr.  (Id. at 16-17.) Therefore, as of 2007, Martinez was no longer Plaintiff's supervisor.[11]

In the complaint, Plaintiff alleges that Martinez created a hostile work environment, including by making a comment about the wealth of individuals of Indian nationality.  (Compl. ¶ 32.) This statement was made in June 2009.  (Pascal Decl., Ex. B at 46:15-47:1.)  Defendant moves for summary judgment on the hostile work environment claim on the basis that Plaintiff

---

[11] There is some discrepancy in the record as to the dates that Martinez was Plaintiff's supervisor.  The Court accepts for purposes of deciding this summary judgment motion Plaintiff's assertion that Martinez was his supervisor until some point in 2007.

failed to make timely contact with a counselor from the Equal
Employment Opportunity Commission (hereafter, "EEOC"). (Def.'s
Br. 6.) According to Defendant, Plaintiff was required to make
contact with an EEO counselor within forty-five days of an
allegedly unlawful act, yet Plaintiff did not contact the EEOC
until October 19, 2009, which was more than forty-five days
after the June 2009 comment. (Id.) Plaintiff responds that the
relevant date for purposes of the EEO contact is September 23,
2009, the date that Plaintiff learned he was not selected for
the Level-14 position. (Pl.'s Opp. Br. 22.) According to
Plaintiff, the hostile work environment claim is based on the
events that occurred between 2005 and 2007, which "resurfaced
and culminated" in 2009 when Plaintiff was not selected for the
Level-14 position. (Id. at 23.) If this latter date is used,
then Plaintiff's contact with an EEO counselor was made within
twenty-six days and was therefore timely. (Id.)

A federal employee who wishes to assert employment
discrimination claims must exhaust his administrative remedies.
Haines v. Adm'r., U.S. Fed. Transit Admin., 579 F. App'x 63, 65
(3d Cir. 2014). Pursuant to 29 C.F.R. § 1614.105(a)(1), "[a]n
aggrieved person must initiate contact with a Counselor within
45 days of the date of the matter alleged to be discriminatory
or, in the case of personnel action, within 45 days of the
effective date of the action."

Here, the only act that took place within forty-five days of Plaintiff's contact with an EEO counselor was Plaintiff's receipt of notice that he was not selected for the Level-14 position. A hostile work environment claim, however, "involves repeated conduct" that "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). Plaintiff's hostile work environment claim therefore cannot be predicated only on Defendant's failure to promote him to the Level-14 position. See id. at 114, 122 S. Ct. 2061 (failure to promote is discrete act that constitutes separate actionable unlawful employment practice). Indeed, Plaintiff does not appear to base his hostile work environment claim solely on his failure to be promoted, as he argues that the failure to promote was merely the "culmination" of years of a hostile work environment. (Pl.'s Opp. Br. 23.)

Although the majority of the conduct that gives rise to Plaintiff's hostile work environment claim occurred outside of the statutory time period, this is not necessarily fatal to Plaintiff's claim. Under the "continuing violation" theory, if a defendant engages in acts that are not individually actionable, such acts may be aggregated to make out a hostile work environment claim. Mandel v. M&Q Packaging Corp., 706 F.3d

46

157, 165 (3d Cir. 2013).  The individual acts "'can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period.'"  Id. (quoting O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006)).  To demonstrate a continuing violation, a plaintiff "must show that all acts which constitute the claim are part of the same unlawful employment practice" and are not isolated or sporadic acts.  Id. at 165-66.

In this case, the incident that was timely reported to the EEO -- the failure to be promoted -- is not related to the events in 2005 through 2007.  In Morgan, the United States Supreme Court noted the following example: if acts on days 1 through 100 and day 401 contribute to a hostile work environment, the act on day 401 can pull the other acts in for purposes of liability, provided that the act on day 401 was related to the acts between days 1 through 100.  Morgan, 536 U.S. at 118, 122 S. Ct. 2061.  However, if the act on day 401 is not related to the acts between days 1 through 100, then the employee cannot recover for the previous acts by reference to the day 401 act.  Id.

Here, Plaintiff made clear in his EEO affidavit that Martinez discriminated against Plaintiff in 2005 through 2007 because of his "whistle-blowing" activities as to two of Plaintiff's friends.  (Pascal Decl., Ex. A at 3.)  This conduct

47

is actionable under 42 U.S.C. § 2000e-3.  Jensen v. Potter, 435
F.3d 444, 449 (3d Cir. 2006), overruled in part on other grounds
by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126
S. Ct. 2405, 165 L. Ed. 2d 345 (2006).  However, in opposition
to summary judgment, Plaintiff alleges that he was not promoted
in 2009 because of his race, national origin, or religion.
(Pl.'s Opp. Br. 24.)  This conduct is actionable under 42 U.S.C.
§ 2000e-2.  Therefore, the act that occurred within the time-
period for making EEO contact -- i.e., Plaintiff's non-selection
for the Level-14 position based on alleged discrimination --
cannot be used to bootstrap separate, unrelated conduct based on
whistle-blowing that occurred in 2005 through 2007.

Moreover, the continuing violation theory cannot be applied
to aggregate "discrete" acts that are individually actionable.
In Morgan, the Supreme Court established a bright-line
distinction between "discrete acts," which are individually
actionable and must be raised within an applicable limitations
period, and acts "which are not individually actionable but may
be aggregated to make out a hostile work environment claim."
O'Connor, 440 F.3d at 127 (citing Morgan, 536 U.S. at 113, 122
S. Ct. 2061).  The Third Circuit set forth a non-exhaustive list
of "discrete" acts for which the limitations period begins to
run from the date of the act: "termination, failure to promote,
denial of transfer, refusal to hire, wrongful suspension,

48

wrongful discipline, denial of training, wrongful accusation."

Id.

Applying the bright-line distinction of Morgan to the claims here, the Court finds that nearly all of Plaintiff's claims from 2005 through 2007 fall into the category of "discrete" acts.  Plaintiff's hostile work environment claim is primarily based on Martinez's failure to transfer Plaintiff back to his permanent position after he was assigned to temporary detail.  (Pascal Decl., Ex. G.)  Plaintiff also contends that he was denied the opportunity to work from home while he was sick, arguing that Martinez wrongfully accused him of "illegally teleworking from home, without any valid paperwork."  (Id.; Pascal Decl., Ex. A at 8.)  In addition, Plaintiff contends that he was denied training, particularly the ability to participate in the Executive Leadership Program.  (Pascal Decl., Ex. A at 5.)  These discrete acts of failure to transfer, wrongful accusation, and failure to train are not actionable because they are time-barred, even if they were related to Defendant's failure to promote Plaintiff to the Level-14 position in 2009. See Morgan, 536 U.S. at 113, 122 S. Ct. 2061 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").

Finally, even if the conduct in 2009 can be used to save the conduct occurring in 2005 through 2007, the Court finds that

Plaintiff fails to present evidence in support of a hostile work
environment claim.  "To establish a prima facie case of a
hostile work environment under Title VII, a plaintiff must show:
(1) that she suffered intentional discrimination because of her
membership in a protected class [or because she engaged in
protected activity]; (2) that the discrimination was severe or
pervasive; (3) that the discrimination detrimentally affected
her; (4) that the discrimination would have detrimentally
affected a reasonable person in the same position; and (5) the
existence of respondeat superior liability." Barnett v. New
Jersey Transit Corp., 573 F. App'x 239, 245 (3d Cir. 2014)
(citing West v. Philadelphia Elec. Co., 45 F.3d 744, 753 (3d
Cir. 1995)); Jensen, 435 F.3d at 449 (recognizing claim for
hostile work environment based upon retaliation for engaging in
protected activity).

Plaintiff failed to adduce any evidence that he was treated
poorly at work from 2005 through 2007 either because of his
membership in a protected class, or because he reported
Martinez's friends for misconduct.  Plaintiff may not rest upon
his mere allegation that the conduct was based on an
impermissible motive.  The only evidence of discrimination
presented by Plaintiff is Martinez's statement concerning the
promotion decision, and there is no indication from this
statement that religion played a factor in the manner in which

Plaintiff was treated between 2005 and 2007.  Even if the failure to promote Plaintiff to the Level-14 position was based on religious discrimination, this is only one instance of discrimination and can by no means constitute "severe or pervasive" discrimination sufficient to support a hostile work environment claim.  Plaintiff's failure to present any evidence to demonstrate a causal nexus between his treatment from 2005 to 2007 and an illegal motive warrants judgment in favor of Defendant on Plaintiff's hostile work environment claim.

V.   **CONCLUSION**

Defendant's motion for summary judgment will be granted in part and denied in part.  Judgment will be entered in favor of Defendant on all claims except Plaintiff's claim in Count One for Title VII discrimination based upon religion.  An Order accompanying this Opinion will be entered.

```
                              s/ Noel L. Hillman
                              NOEL L. HILLMAN, U.S.D.J.
```

Dated: June 29, 2015

At Camden, New Jersey